24-13-82 Alaska Community Action on Toxics et al. Petitioners v. United States Food and Drug Administration and Marcy McGarry in his official capacity as Commissioner of the United States Food and Drug Administration. Ms. O'Brien for the Petitioners, Ms. Neumeister for the Respondents. Good morning, Council. Ms. O'Brien, please proceed when you're ready. Good morning. May it please the Court, it's Catherine O'Brien for the Petitioners. I'd like to reserve 3 minutes of my time for rebuttal, please. This Court should hold unlawful and vacate FDA's order maintaining approval for the use of 5 toxic phthalate chemicals as food additives. As FDA explained in the proceedings below, the Food, Drug, and Cosmetic Act makes clear that food additives must be shown to be safe, and FDA acknowledges that under this standard, it must revoke approval for food additives if the evidence before the agency does not provide reasonable certainty that the additives used will cause no harm to human health. But here, FDA arbitrarily rejected decades worth of evidence showing that the phthalate additives do not meet the safety standards. First, I see the issues in this case. The first question is standing. Do you want to address that? Certainly, Your Honor. The petitioners have standing because it is undisputed that FDA's authorizations for the use of the phthalate additives cause petitioners, members, and their children to be exposed to these toxic chemicals in their food. And this places them at substantial risk of serious health harm. Will I, too, have standing? Your Honor, it would depend on the foods that you eat and whether you're talking about foods like chicken. We are. So we're not talking about exotic dishes. That's correct. Unfortunately, the phthalate additives have. Oh, I'm sorry. What case you think is strongest in support of your claim of standing? Well, to address your specific question, Your Honor, about the widespread nature of the harm, I would rely on this court's decision in public citizen versus National Highway Traffic Safety Administration at 489 F3rd 1279, where the court held that the fact that many people face a risk of bodily harm does not undermine standing because the risk of bodily injury is sufficiently particularized, even if it's widely shared. Do you agree that the two-pronged test in public citizen has been set aside, at least in part, by the Supreme Court in the Susan B. Anthony case? The formulation is different, Your Honor, and I think the formulation is different even in this court's cases. Not all of the cases that deal with a risk of future injury utilize the two-part standard that's articulated in public citizen or in the food and water watch case, but I think fundamentally they're getting at the same question and they're consistent in holding that petitioners have standing where they show that their members are exposed to a toxic chemical because of the challenge agency action, and they have realistic health concerns because of that exposure, as the court stated in the Queen Wisconsin case that's discussed in our briefing. And so the clearest statement of that is in what the Aikens case, ATTINS, by this court. I'm sorry, Your Honor, the Addias versus Careproof case? Excuse me, I'm sorry. Would you mind repeating the case name, Your Honor? ATTINS, DC Circuit, opinion written by Judge Griffith. Thank you. So that's cited in the brief, but in any event, it seems to me the formulation that you've just described is what we said in Aikens, that it's enough to look at what the harm is and whether the cause is the agency action that you're challenging. That's correct. In the Addias versus Care First case that's discussed in the briefing, the court affirmed that it's frequently upheld claims of standing based on a substantial risk of future injury. And it held that the court considers whether the petitioner's members face a substantial risk of injury as a result of the challenged action. And here we know that is the case because FDA acknowledges that its authorization for the use of the phthalate additives contaminates food. The petitioner's members attest that they regularly eat and their children regularly eat foods in which the phthalate additives are found. They have specific concerns about health effects from that exposure, including cancer, endocrine effects and reproductive harm. Where does EPA acknowledge the foods your clients eat are contaminated? Well, FDA acknowledges that the approved uses of the phthalate additives contaminate food. If that were not the case, these chemicals would not require approval as food additives. Counsel, just so you're clear, I took your word contaminated to mean a danger to health. And EPA has authorized these additives in food. And so you're trying to show that it ought to re-examine. In other words, I didn't see that the FDA was giving away the case because it has a different view than you do of what the statute requires in the way of what I think you would agree is at least your burden of persuasion. That's correct, your honor, and I apologize if my use of the word contaminated was not precise. FDA does not acknowledge that the presence of the phthalate additives in food presents health concerns, but they do acknowledge that their authorizations are responsible for the presence of the chemicals in the food. And FDA also does not dispute that it has not considered and has not assessed the safety of these chemicals for roughly half a century. And in the intervening decades, substantial scientific evidence has been developed that is fundamentally. Counsel, I don't think that's disputed by FDA. What FDA says, as I understand it, it says that it had to decide if the petition showed enough for the agency to conclude or find that these additives are no longer safe. In other words, to distinguish the status quo, which says they are safe. And so its response to your petition, and I acknowledge one of the problems you faced was that you started this case with twenty eight additives and as the case proceeded, it was down to five because the manufacturer stopped producing twenty three of the drugs. So, didn't EPA, sorry, didn't FDA explain why your three pronged approach in your petition was not persuasive? The agency did explain its view of why the three step argument in the original petition, the agency did not find persuasive, but that does not relieve the agency of an obligation to rationally consider and determine whether there remains a reasonable certainty of no harm from the use of the five additives that remain approved. The agency responds by saying, one, we're denying your petition, but the drugs of which you're concerned, the additives, I'll call them, are on our list to examine them. And furthermore, we have issued a request for information to get updated data on all of these studies regarding these additives. But it didn't accept your three pronged approach. And don't you have a burden of persuasion at least? And EPA, sorry, I keep saying EPA's, FDA explained why it found your approach unpersuasive. It critiqued your theory of how the drugs function. It critiqued your theory about a single standard. And to the extent you were faced with this change of circumstances, it said it was too late to change your theory now. And in the objections, your honor, the petitioners addressed FDA's rationale and the underlying petition denial and explained why it did not provide a reasoned basis for the FDA's decision. And there are essentially three components to that critique, the arguments that were advanced in the objections. Number one, as the petitioners explained, and they bolstered the record on this at the objection stage, the FDA did not consider when it approved these additives that they cause serious health harms to people that are now well documented in the scientific literature. So, just one, it's not denying that I'm trying to understand is you came to the agency with a three pronged petition. And the agency responded saying, one, you got the mechanics of the drugs wrong. Two, we couldn't bunch them all together and just have a single safe level. And you wanted to change your theory in the middle of the case. Normally, that's the kind of thing under an APA review we would defer to. Now, even under Loper Bright, there's still under Skidmore, a level of deference to agency expertise and the agency argues here. This is, you know, what the mechanics of these drugs and how they function, et cetera, is very much a matter of expertise, not for judges. And this court has previously taken that position. So how do you respond to all that? Your honor, I would begin by characterizing the petition differently. What the petition asked was for FDA to revoke approval for 28 phthalate additives that were approved at the time of the original petition a decade ago. Included in that group of 28, of course, were the 5 that we're still arguing about today. As to those 5, the petitioners argued that none of the 5 meets the safety standard any longer. And they provided new toxicity evidence that is specific to each and every one of the 5 phthalate additives that are still approved. That your petition asked that all these drugs be treated alike. That secondly, based on that, you came up with a level showing what would be safer on safe consumption. That was your theory, wasn't it? That was the theory. That was the argument supporting the request for agency action, which was the revocation of each of the authorizations. And at the time, what I'm trying to focus on is, I didn't think there was any dispute about what your original theory was. I thought the problem was the ground shifted under you and the agency took the position of that. It was not the stage at which you could change your theory when you're dealing with objections. That you had to file a new complaint. That's sort of docket control and interpretation of its regulation. But that interpretation is not supported by the regulations or by the Food Act. The Food Act is clear that at the objection stage, and this is somewhat unusual for petition proceedings before agencies, but it's what the statute provides. The statute provides that petitioners can introduce new evidence at the objection stage, and they can make new arguments at the objection stage. The key is whether the objections are within the scope of the original petition and whether the objections identify errors in the order rejecting the original petition. And the petitioners remained within that allowable sphere here. And we know that because, as I said, we requested revocation for the approval of these five additives in the original petition. We presented new toxicity evidence specific to each and every one of them. So, we were not relying on the cumulative effects argument to show that for these five chemicals specifically, there is new information that undermines the safety finding. We also provided in the 2016 petition exposure data specific to three of the five valid additives that are still approved. Those were the only ones that had exposure data available. And that data showed that exposure to those chemicals exceeds safe levels. FDA... Is what you're saying now, is it different from the theory that was addressed in the initial decision, which is that at the time, all 28 are in the case, and then all 28 are treated by your petition, by the argument supporting your petition, as uniform, in that they all ought to be seen as in alignment. So, there's 28 that are in alignment, and then there's an ADI acceptable daily intake, I think, that applies to one of them, and it ought to be applied to all 28. And then there's a spread between what's actually in took and taken, and the acceptable one, and that ought to be applied across the board too. So, it was kind of an across the board argument was what was presented. That's correct, and that was necessary when we were dealing with the class of 28, because we didn't have specific toxicity and exposure information for all 28. And so the most persuasive case, when there were 28 on the table, was to make that class analysis argument, and that was consistent with the decision that FDA had just issued concerning PFAS chemicals that had been used as additives. And that's why the petitioners took that approach. But then FDA took an independent action, as Judge Rogers alluded to, to revoke approval for 23 of the 28. At that point, any arguments about whether those 23 were safe had become moot, and it would have made no sense for the petitioners to continue pressing their arguments about those 23. Fortunately for the petitioners, their arguments about the remaining 5 were not dependent upon that broader cumulative effects argument for the group of 28. And so the petitioners went forward by simply narrowing the scope of the administrative relief and the scope of the arguments to focus on the 5. It could be, though, that even if the case gets narrowed from 28 to 5 because of the abandonment, then it could be that the theory stays the same, which is that there used to be an alignment as to all 28. If there's alignment as to all 28, of course there's alignment as to the subset of the 28, because if all of them are related in the same way, then so is the subset. And then if that's the way that the case proceeds, then there's nothing that changes. It's just that you're addressing the same theory, it's just on a narrower set of phthalates. And it follows like the night follows the day, because if the petitioners were right as to the original 28, then they would necessarily be right as to a subset, too. And the case goes forward on that understanding. And then what you're indicating is, no, that's actually not what happened or the right way to look at it. At the objection stage, the theory just changes. The theory is no longer that what's left is in alignment in the same way that the 28 were in alignment. There's new evidence that comes into play, and all that can be considered with respect to those phthalates that are still left on the table. That's correct. And the other thing I think that's important to understand is that the narrower arguments with respect to cumulative effects that the petitioners presented in their objections were responsive to what FDA had said when it denied the underlying petition. And in our view, this is exactly how the objection process is supposed to work. So when FDA denied the original petition in 2022, it said, essentially, we don't buy this broad argument that all 28 are sufficiently related to be treated as a class. What we think would be more supported would be to focus only on a subset of the phthalates that have been shown to have so-called antiandrogenic effects, which means that they interfere with the production of testosterone during fetal development. In the objection, the petitioners narrowed the cumulative effects argument to do precisely what FDA had indicated would be proper and said to FDA, we seem to be in agreement that there's a group of phthalates that are still approved that you acknowledge are established antiandrogens, and at a minimum, those have to be considered as a class. And in addition, all of the five have new toxicity evidence and exposure data that establish that there is no longer reasonable certainty of no harm. So while it may be the case that the regulatory landscape has changed and the strongest arguments we have for the group of 28 are no longer germane, there is still evidence that is irreconcilable with the statutory standard, a reasonable certainty of no harm. And FDA was obligated to consider that rationally. In this regard, I think it's helpful to think about a hypothetical. Let's say that FDA had granted our petition based on all 28, and all 28 were still approved. And it accepted that broad class-based argument, the three premises that Judge Rodgers described. And then you had a manufacturer who filed objections. They only manufacture one phthalate. Let's say it's DINP. I don't think FDA would argue that that manufacturer would be limited to responding to the three premises that supported our petition. They would be free to make out the case that DINP is safe. And the statute and the regulations are clear that they could introduce whatever new evidence they wanted to at the objection stage, and they might be entitled to an evidentiary hearing. And FDA would have an obligation to consider that evidence fully. Well, I understand to the extent you're making that argument, that there is a way to read what FDA did as endorsing that. But FDA also critiqued the type of studies on which you were relying, the type of data those studies used. So, even if your theory is the same as you say, and you had this data as to the five on toxicity, there is this problem that FDA saw as to the nature of the studies. What's your response there? Our response is that FDA only critiqued a subset of the evidence, and the reasons that it gave for rejecting that evidence are contrary to the evidence that is actually in the record. And this court, while giving appropriate deference to agencies, repeatedly has held that the agency must provide a reasoned basis consistent with the evidence before it for rejecting the evidence. So, as I understood the FDA's position, and maybe I misunderstood it, on your overall approach with the 28, they explained why they didn't, or were not persuaded by your theory that all of these should be treated the same. It also said that, that aside, there's a problem with the nature of the studies on which you're relying, and it explained why. So, moving to the objection stage, I understand your point about you just continued and you had new toxicity evidence. But what about the concern that FDA had with the nature of the studies? FDA identified two purported defects with the toxicological evidence specifically, but neither of those is consistent with the evidence before the agency. And under this court's precedent, for example, the L.A. County versus Shalala case, that is not a reasoned basis for denying the objection. So, first, I don't understand. And I understand the point about it's not supported by the evidence in the record, but that was not the nature of your objection. The first objection, Your Honor, argued that FDA did not appropriately address the new toxicity studies, the new toxicity studies that established numerous health effects that FDA did not consider when it judged the chemical safe. You're more familiar with the record than I am. But I thought an FDA can explain, when it has a chance to argue, that the defects it found in the studies that supported the 28 in the original petition remained, even as to the five. So, FDA did have a couple of particular critiques, and I would like to explain why they are not rational. They criticize the toxicity evidence and also the exposure evidence. They said two things were wrong with the toxicity evidence, neither of which is rational. Number one, they said that it was not appropriate for the petitioners to rely on epidemiological studies, which are studies that document adverse health effects in human populations associated with exposure to a toxic chemical. FDA says in this proceeding that epidemiological studies generally are not useful for risk assessment. That's at JA-9, but as we explained, that attitude towards epidemiological studies is contradicted by FDA's own approach when it looked at the evidence concerning the most widely used phthalate additive, in 2012. In 2012, FDA conducted an assessment of the toxicity evidence on DEHP, relying heavily on epidemiological studies, but neither did the petitioners here, Your Honor. So, that was the concern about the epidemiological studies, but there was a second concern. The second concern, which I imagine you're alluding to, Your Honor, was that the petitioners supposedly didn't provide dose response studies. These are the animal studies that are used to establish the level of exposure to the chemical that's associated with a toxic effect, but FDA's statement is simply incorrect. As the petitioners pointed out in our opening brief, we provided numerous dose response studies, which are cited at page 38 of our brief. And after we pointed this out, FDA sort of pivoted and said, okay, it's not that there were no dose response studies, but supposedly the dose response studies are deficient. But again, the reasons that FDA asserted for this supposed deficiency are flatly contradicted by the record. So, first, FDA said that the dose response studies were not appropriate because they supposedly only addressed mixtures of chemicals, which FDA said would not allow the agency to determine whether a particular phthalate additive caused the toxic effect observed. But that is simply not correct. As we explained at page 20 of our reply brief, if you look at just the abstracts of those studies, they made clear that they did assess mixtures and they also assess and provide a dose response data for individual phthalate additives. Yeah, here's what's troubling me. There's a dispute here as to whether or not the petitioners submitted enough for FDA to conclude that it should vacate the rule. Your position is the statute only requires you to raise serious questions, that you don't have a burden to prove that the additives are unsafe. That that's the FDA's burden. But, from the court's perspective, are you asking us to review these studies and basically find that there was clear error by the agency when it evaluated the animal studies and the human studies? That's what I'm trying to understand in this analysis. I don't see this as a case where, you know, did the man fall on the sidewalk and break his leg. But rather, there is some expertise involved. And EPA doesn't, I have EPA on the line because there was an EPA case, but the FDA does not view the types of studies for these five drugs enough for it to conclude that the petition has shown enough that it should vacate the rule and disrupt what it describes as, you know, the status quo. That it views you as having a heavier burden than simply raising questions. And it makes an argument based on the statute, purpose, the structure, history, EPA's interpretation, and it distinguishes the EPA case, the other drug, which was an initial authorization case, where the FDA actually set some conditions. So I'm just wondering, what is the court's role here? Under an APA, I mean, if it's an error of law, that's one thing. But now we're talking about judgments about technical studies. And your argument, as I understood it, is it's just flat clear that any reasonable person would understand that you raised enough of an issue that FDA ought to go so far as to vacate its current rule. So if I may, Judge Rogers, I think there are three important points to respond to your question. So first, there is an error of law here. As your Honor referenced, the FDA applied a legally erroneous burden of proof to the petition, requiring the petitioners to provide essentially quantitative proof that dietary exposure to the additives exceeds an established safe level. And there is no basis in the Food Act or FDA's regulation for applying that burden. It talks about full studies, though. And full studies were provided, hundreds of them, your Honor. In addition, we provided authoritative assessments from FDA's peer regulators, including the Consumer Product Safety Commission, which concluded that phthalates that are still approved by FDA do not meet a reasonable certainty of no harm standard and bans them from children's products, despite finding that the main source of exposure to children is from food. We also provided two declarations from leading experts in health effects of phthalates and exposure to phthalates who synthesized the evidence and concluded unequivocally that the ongoing use of these chemicals in food is presenting severe health risks to children and other members of the population. So there is a legal error with respect to the burden. In addition, this court... So I started out there by asking, I assumed, but maybe I was wrong, that you do not agree that you have the burden of persuasion. And the question is, the burden of persuasion of what? Yes, we agree with FDA's statements in the record and in its brief that revocation petitions have to establish safety questions that are significant enough to support a finding that there is no longer a reasonable certainty of no harm. So it's not any question. It's not any one study, as FDA used as a hypothetical in its brief. The questions have to be significant enough to make it untenable to have a certainty of no harm. But that still is different from proving quantitatively, as FDA demanded here, that exposure in food is exceeding a safe level. That's where we part ways with FDA. But even assuming that FDA is correct about the burden, it did not make a reasoned decision based on the evidence in the record. And I think it is helpful... Can I ask you just quickly on the burdens? Sure. So you're agreeing that you have a burden. Yes. You have a burden to raise significant questions, questions that are significant enough to support a finding that there's no longer a reasonable certainty of no harm. That's not just a burden of production. You have to introduce materials that substantively get you past the threshold. Agreed. There could be some dispute about what the threshold is, but I actually don't think there is. I think everybody agrees what the threshold is, which is that the questions have to be significant enough to support a finding that there's no longer a reasonable certainty of no harm. So with the decisions, as I read the decisions, both the first one and the second one in response to the objections, they did enhance the right standard. They did. They enhanced it several times, and then they enhanced it in their conclusions, too. And the conclusion would be, therefore, there's not significant enough evidence that there's no longer a reasonable certainty of no harm. Lots of negatives and positive qualifiers, but I think that's roughly right. So it's not that the standard was articulated incorrectly or was not articulated correctly in its conclusion. Then where's the legal error? The legal error is in the application of the standard. They did not, in fact, apply that sufficiently significant question standard, and I think there's two ways that we see this. Number one, there are statements in the record that are inconsistent with the articulation of the standard that Your Honor just offered, and we've cited them in our brief, including in the order at JA-6, FDA stated that petitioners had to prove that, quote, dietary exposure levels from the approved uses exceed a safe level. So that, I submit, is an example of them articulating a standard that's inconsistent with what they recited elsewhere, but I think it's actually most concrete if we contrast FDA's decision here with its decision revoking approval for what we refer to as the PFAS additive. So in that decision in 2016, FDA revoked approval for existing additives because the petitioners provided new studies that were not even specific to the chemicals at issue, but new studies on related chemicals showing that there was evidence of reproductive and developmental harm, and FDA acknowledged those studies and said they had a lack of data that was specific to the additives at issue that could resolve the safety questions presented by the new studies, and a lack of data to quantify exposure, and because they had new evidence of toxic effects from related chemicals that they thought was relevant, and they didn't have either more specific toxicity evidence or exposure evidence to resolve those concerns and conclude that the ongoing use was safe, they revoked approval. Now, FDA's order said that the reason for the different outcomes is because there supposedly was not comparable evidence here, and I would agree. The evidence here was orders of magnitude stronger. So in the PFAS decision, as I mentioned, FDA had no toxicity studies specific to the three chemicals that the petitioners were asking to revoke, but here we have studies for each of the five phthalate additives that documents that those specific chemicals cause adverse health effects. In addition, FDA, as I noted, with the PFAS additive said we don't have data to estimate dietary exposure. We don't know how much of these chemicals people are really eating, but here, in contrast, the petitioners presented multiple lines of evidence indicating that real-world dietary exposure does exceed safe levels. So the evidence here is substantially stronger, the record much more extensive, and the reason that we have a different result is arbitrary decision-making. Let me make sure my colleagues don't have additional questions at this time, and we'll give you some time for rebuttal. Thank you. Just one or two for me. This is Judge Katz, just orally. You do not, I'm taking you back to standing. The risk of harm must be substantial in an absolute sense. It's not enough if exposure increases a cancer risk from one in a trillion to two in a trillion on the theory that that's a hundred percent increase, correct? I think that's correct, Your Honor. We agree that the increase in risk has to be substantial, and here we know that the increase... But the absolute risk has to be substantial is what I'm more interested in. As opposed to the increased risk? Yes, Your Honor, that's correct. Okay. So that's a very open-ended standard. What help can you give us in thinking about this question of substantial risk where we're talking about long-term exposure to something that might, in the distant future, present a substantial health risk? Your best cases on standing on this point, I think your best case on standing on this point involves ozone, which is very different, right? You breathe ozone and your lungs get irritated, and that's an Article III injury. That's easy. It seems more akin to public citizen in the sense that the causal chain is very long and hard to assess. So how do we think about substantial risk in a case like this? Your Honor, I would submit that this case is on all fours with the many cases I was discussing earlier in which the court has held that exposure to a toxic chemical attributable to the agency action can support standing. So, for example, in the California Communities Against Toxics case that we discussed in our briefing, that case was about an exclusion from RCRA regulation for certain hazardous waste facilities, and the petitioner's members lived nearby. They asserted that they had concerns about health consequences from looser regulation of those hazardous materials, not necessarily that there was going to be an immediate health effect like lung irritation, but rather that they would be exposed to greater levels of toxic substances, which also would be associated with diseases that might have a long latency period. This is frequently the case in cases that this court adjudicates after finding standing that involves exposure to toxic chemicals. Moreover, it is the case here that the phthalate additive can pose acute health risks, so it's not necessarily the case that the time period between exposure and effect is long. But even if it is long, this court has frequently found standing in such cases. For example, any case involving exposure to a carcinogen, the exposure is going to be remote in time from the effect, but where the petitioners establish based on their declarations and evidence in the record that the exposure gives rise to realistic health concerns, the court has recognized that that is an Article III injury. And I think it's helpful to contrast the cases that FDA relied on. The problem in the cases that FDA relied on, such as the food and water watch case, was that the court found that the petitioners were speculating about whether the action they were challenging was really going to increase their members' exposure to the substance or the activity that they alleged was causing them harm. But here, there's no need for that speculation because we know that FDA's authorizations are causing the phthalate additives to be present in food that petitioners' members eat right now. So, they're experiencing exposure that's current and ongoing. So, showing of exposure plus concern upon reasonable fear of harm? A substantial risk, Your Honor. And I would assert that in this... I'm sorry. No. Okay. That's helpful. Thank you. And I think what's key in this case, Judge Katsas, is that we're not relying on the subjective concerns of the petitioner's declarants, but rather the expert declarations in the record and the other evidence that establishes that exposure at realistic levels from the foods petitioners' members and their children are eating does pose risk of serious health harm. Can I ask you a follow-up on that? And I don't... But, Judge Katsas, if you were going to follow up, go ahead. But if you were going to... No. I'm all set. Thank you. I have one follow-up on standing, which is that there's a general principle in standing law that we assume the merits in favor of the person who's seeking relief. And so, in this case, I'm not completely clear in my mind on how all that works out, because at some high level, your merits theory is, look, there's these additives that are unsafe, or at least there's no reasonable certainty that they're safe. And so, you need to do something about it. You, the agency, need to do something about it. And for standing purposes, do we take that underlying merits theory as a given, that you're right about that, and then we measure standing, assuming that baseline? Or do we not take that as a given? Because in some ways, asking you to show that there's a substantial risk of harm is similar to the ultimate merits, which is, your theory is, you should shift things in that you should no longer leave these authorizations in effect, and you should repeal them, because there is a substantial risk of harm. Yes. I think that's absolutely correct, Your Honor. And I think, as the court has held routinely, the court does assume that the petitioners are right on the merits to assess standing. And here, that would require the court to assume that it was arbitrary for FDA to conclude that there are not health risks associated with the ongoing use of the valid additives under these authorizations. So that, for purposes of standing, the court does have to assume that there are health risks, significant health risks, arising from the ongoing use. Here, to be candid, we don't feel we need to really lean into that assumption, because the evidence in the record is very strong from independent experts that the risk of harm is substantial. But you are absolutely correct that the presumption does apply, that we're correct on the merits. Because some of our decisions, and some of the decisions in the area, do articulate the requisite showing on the part of the party seeking relief as a burden to show harm, or at least a risk of harm. And in cases in which the merits inquiry is about the risk of harm, too, it's just not entirely obvious how those interrelate. If there's an independent Article 3 obligation to show a risk of harm, but if the merits, then, is also bound up in the risk of harm, then it's not entirely clear to me how all that washes out. But the way you're looking at it is to say, you assume the correctness of our theory on the merits, which is that these ballots need to be regulated in a way they haven't been so far, precisely because of the risk of harm that they pose. That's correct. But I think even if the court determined it has an independent obligation to establish, without that assumption, that there's a substantial risk of harm, the record in the Declaration of Family support that. Make sure there's no further questions at this time. Not for me. Okay, thank you. Ms. Neumeister. Thank you, Your Honor, and may it please the Court, McCain-Neumeister, on behalf of the government. In authorizing the use of phthalates as food contact substances, FDA determined that there was a reasonable certainty that such use would not be harmful. Petitioners have not carried their burden of disturbing that determination or of demonstrating Article 3 standing to pursue this petition for review, and their submissions are inadequate on both standing and the merits because they haven't made an adequate showing regarding a lack of safety and because they're operating at a high level of generality that doesn't satisfy robust showings applicable in these circumstances. To disturb the status quo and require FDA to repeal existing authorizations, it was not enough for petitioners to submit some new studies that raise questions about safety in the abstract. Rather, they had to submit sufficient data to establish a finding that there's no longer a reasonable certainty of no harm. The sufficient safety questions that they have to establish are sufficient because they demonstrate that there's no longer that reasonable certainty, and they have not adequately supported that finding here. Now, I'd like to start... That standard, quite extreme, though. Substantial showing... I mean, they're those double knots, but I mean, that there is no longer any harm. I mean, that's what they say all their studies showed, and FDA just chose to reject that showing and decided to go its own way through the request for information. Whereas, the petitioners are saying, we've met our burden of persuasion under this standard to raise substantial questions with this double knot requirement. My question in this case would be, what more could anyone show to meet the standard as FDA has suggested it is here? Because if the petitioners are right about your own rules allowing a petitioner essentially to start all over again at the objection stage, then a lot of these procedural points and docket control and deference to the agency will disappear. Yes, Chandra. In order to satisfy their burden, the evidence that they're putting into the record and relying on has to be enough that would justify a finding that there's no longer a reasonable certainty. When you're asking that question, you have to work within how FDA analyzes safety and does its risk assessment. And that's what they did in their petition in the first instance. Their food additive petition acknowledged the burden and attempted to show that there were these sufficient questions undermining the reasonable certainty by comparing the acceptable daily intake to the estimated exposure. And that's one of the ways FDA in general looks at this safety and risk assessment by comparing those two values. The petition tried to do that, and if they had succeeded, then there would have been a reasonable question if they had shown that based on this new evidence that was adequate and scientifically supported, that there is a reason to believe that the actual daily exposure to these substances exceeds a level that is safe based on scientifically supported evidence, usable evidence based internationally recognized guidelines that FDA applies. If they had done that, then there would be these reasonable questions. But the agency explained for three reasons why they failed to meet the burden that they had set out to meet in their petition. The first was because they were pursuing solely a class-based analysis where they were looking at... My question is based on the assumption, and you can tell me that assumption is wrong, that at the objection stage, you can start all over again. So at that point, they were only dealing with five drugs. They looked at five drugs, five additives, and they introduced exposure data, and they introduced expert evidence, and they introduced studies. So my question is, if that is procedurally correct, which I did not understand your brief to accept, and that's why I said assume that is correct, then why haven't they met their burden of persuasion along the lines that the chief judge was discussing? So it is not procedurally correct that they can do that, Your Honor, and I'd love to address the many reasons why. But assuming that they could reframe their petition this way at the objection stage, it's hard to even accept that premise because the analysis would have been very different. But even if they could, they have not shown by acceptable evidence that meets these international guidelines for what is adequate science that FDA applies in assessing these studies. They have not shown that there is this no longer reasonable certainty. But just stepping back, in their petition, they sought a class-based analysis, and they specifically— Can you go into procedurally why it's not permissible to do this? Yes, Your Honor. Before you do that, I definitely want to hear that. But before you do that, does the agency decision in response to the objections do the even-if analysis, which is that even if procedurally it's okay to proceed in this fashion, the evidentiary stuff that was introduced at this stage still wouldn't be sufficient? So it does address the new studies that they put into the record and explained why those are not sufficient. I also just want to note, for the first time before this court, I'm hearing that they now want FDA to do an individual analysis of each of these five chemicals separately. That is not something that FDA understood them to be asking for in their objections, and it's not something that we understood them to be asking for in their brief. We don't read their brief to say that FDA's action was arbitrary and capricious because it didn't separately assess DHP and VINP and DIDP in each one separately and look at the cumulative risk. They proposed a completely new grouping that is outside the scope of the original 28 phthalates in their petition, and that's not just a difference in evidence in the record. That's a different action that they're asking for that requires a different kind of scientific analysis, and you can't short-circuit the process by proposing that the objection stage so that the agency can't seek public comment on that new analysis and can't perform the relevant science and give them an opportunity to object to it. It's very complex scientific assessments that go into this process, which is why if you're going to propose something that is outside the scope of the initial petition and outside the scope of the denial order, it has to come in a new petition. I also just want to highlight, in their original food additive petition, and this is at JA 966-67, they specifically explain that they are asking the agencies to repeal the authorizations for all of these phthalates as a group, and they are specifically saying that they are not asking the agency to go on a one-by-one basis. They say, quote, removing the approval for one orthophthalate may result in its replacement with another one that is less studied and that may pose similar or greater risk. They were specifically waiving any argument that they wanted the agency to proceed on an individualized basis, and so FDA has never tried to engage in that analysis here, and if it did so, it would look very different than scientific analysis that it has put into this proceeding. Let's see. So fundamentally, that's why there is this issue with the sort of new proposed action and new grouping coming at this late stage of the proceeding, but that's just one reason why FDA ultimately rejected their petition and overruled their objections. So there was the grouping issue with the 28 phthalates that we explained. Scientifically, that kind of grouping was not supported. Their objections don't take any issue with the explanation as to the 28 phthalates. The state of play is different now, but the agency also looked at the remaining five phthalates that were within the scope of their original petition and explained why that grouping analysis also wouldn't work, and so the kind of class-based analysis that they have been seeking throughout is not the kind of thing that the agency can do in this case. The agency also looked at the two kinds of specific evidence, the toxicological data with respect to acceptable daily intake and the exposure data, and explained why on both of those bases, the original petition was scientifically deficient. With respect to the acceptable dose intake, one very clean way understand why what they were trying to propose was not adequate is that the agency identified that there are studies of the phthalate that issued the EHP conducted in non-human primates, which are a better proxy for the kind of risk that you would expect to see in humans, that those non-human primate studies would have supported a much higher ADI level than the one that they were proposing in the petition, but petitioners simply did not account for that at all, and when you do not have a full set of reports on safety in a petition, that can unfairly bias the outcome in favor of a particular result, and that's the kind of thing that FDA does not, can't permit in this process, and I think stepping back, it's helpful to just think about the fact that FDA is doing these analyses using a particular kind of approach to this evidence, using these internationally accepted guidelines, and asking these questions a specific way that ensures that the science is good and will support these safety determinations. It couldn't make that determination with respect to the ADI in their petition. With respect to the exposure analysis, there were similar issues. The petition essentially picked exposure numbers from a couple different studies and used the ones that were greater than the ADI without actually explaining why those underlying studies were a representative sample of the American diet and were the kind of studies that could be used to conduct this analysis. One of the studies was from the UK and was outdated. The agency explained that that kind of study might involve different supply chains. There might be different exposure levels, and it's not to say that that study can't be used, but they didn't do the work to explain why it was, in fact, appropriate to use here. You've seen in the briefing, and then you heard this morning also, the notion that the way the agency went about its analysis can't be reconciled with the way it went about the analysis in the prior proceeding involving, I guess it's called PFAS, is that the way we pronounce it? Yes. Each of these proceedings is going to depend a lot on the kind of substances at issue and the studies that are available and the kind of inferences and qualitative assessments that can be drawn in a particular circumstance. The PFAS proceeding involved only three chemicals. We were dealing with a lot more chemicals in this case. In a PFAS proceeding, there wasn't quantitative data available as to exposure and the migration of these chemicals, but the agency determined that it was able to make a qualitative assessment based on biopersistence. It was very specific to the to undermine a reasonable certainty and what evidence they didn't need because they could reach that same conclusion on another basis. That's not something that the agency can do here. In the FAP, petitioners specifically tried to do the normal general analysis that FDA uses in these circumstances, which is comparing an ADI to an EDI. FDA reasonably explained why their comparison simply didn't work. The values they were proposing didn't hold together, were not adequately scientifically supported. Now, in their objection, petitioners switched tack and essentially instead of trying to support the values they had previously proposed or explain why they thought the agency's analysis of those values was wrong, they just abandoned them entirely. They didn't address the non-human primate studies that FDA flagged as a problem with their ADI. They didn't address the UK diet study. They didn't address an Australian and Canadian study that FDA had flagged as potentially more valuable to them and potentially could produce exposure values that they could rely on. They didn't do that at all. Instead, they just tried to flood the zone with a bunch of new studies and pointing out various things that they see the agency didn't adequately consider. They didn't the specific areas of the agency originally identified. By switching tack and sort of approaching it at this higher level of generality, it just underscores that their understanding of their burden in this case is not the way that it has been understood and applied by the agency. It's not enough to have a bunch of safety studies that could raise questions about that might be relevant to safety. The evidence you put in has to itself justify the finding that there's no reasonable certainty of safety. FDA explained why they hadn't done that. I don't want to completely quibble, but I'm going to for a second. You used the formulation justify a finding, and you used that a couple of times, which I totally understand. That's what the standard says is articulated as support of finding. One can imagine that there's an inquiry under which, and as I understand, I don't think anybody disagrees on this. It's not that the statute or the regulations actually set out what the standard is supposed to be. It's just decisions. It's just the agency could shift it over time. They could treat the words as meeting one end of the spectrum of what that word could bear, or they could treat it as coming down on the other end of the spectrum of what that word could bear. The word that's used is support. One possible conception of support is it's kind of like you just have to introduce invisible evidence that raises some question. The way you're talking about it is support as in what would not quite compel, but would justify. I'm just wondering. It seems to me that that's different from just could conceivably support in one set of scenario by some individual. Yes, Your Honor. I want to take the text on its face, but I also want to have an opportunity to speak to why the agency's understanding makes sense given the overall statute in the process here. The text of the standard is not just support a finding. It's significant enough to support a finding, which indicates that it's not enough that it tends to support or is consistent with a conclusion, that it is significant enough that it can support that finding, which in this circumstance means justify the finding, that the finding can be made on the basis of this evidence. That understanding of the standard is consistent with how the overall statute and this process works. So food additives are deemed unsafe before they're authorized. That's 348A. They're deemed to be unsafe unless the agency then issues a regulation authorizing safe use. At that point in time, the status quo has flipped. They go from being deemed unsafe to having a safety determination after a proponent meets a heavy burden of demonstrating that it's—that it will be safe, that there's no reasonable certainty of harm—of no harm. And so after that happens, the status quo shifts. The default presumption is not that these are unsafe anymore. They are authorized. And in order to disturb that status quo, they have—petitioners have the burden of any petitioner walking into an agency and demanding agency action. The burden of persuasion is on them to require the agency to repeal what it has already authorized. And so consistent with that general allocation of burdens and the fact that the statute says they're unsafe until the agency acts, the burden is on them to put enough evidence in the record that the agency can then conclude on the basis of that evidence there's no reasonable certainty. They have not done this. So in this case— Are you invoking—are you invoking our deference—AUER deference on reading of that regulation? I'm not, Your Honor. Just to be clear, the language that we're discussing doesn't even come from a regulation. It comes from the agency's decision. And I—you know, no one disagrees with the wording of the standard. Sorry, the word—the word—the word support? Yes, that doesn't come from a regulation. That just comes from the agency's decision. If you look at JA-1676, it has the standard on that page of the record. I would think if you're—if you're just framing a legal question about what it means to support a finding, to me that sounds more like there is legally sufficient evidence such that if the agency ruled in favor of your opponents, we would not set aside that determination as unsupported by substantial evidence rather than support in the sense of meets a burden of persuasion or compels a finding the other way. If I'm not—I don't know that I—I don't necessarily disagree with Your Honor. I'm not sure that I've quite thought this question through, but I think that the way that the agency— Maybe it—maybe it doesn't matter if it's just words and phrases from your decisions, but— It is, and I—but the way that the agency has understood that is consistent with the way that the statutory process works and normal burdens in these proceedings. And it also helps to think practically what it would mean if the burden were not that way, if it were not required that you actually have to have enough evidence that would justify this finding of no reasonable harm, and it would essentially require the agency to continually redo its safety assessments anytime someone came and put into the record new studies about the safety of an established substance, and that would be an immense amount of work for the agency, and it would remove the stability of these authorizations that Congress intended them to have. Congress recognized that there are competing interests in this space. It's important to make sure that these substances are authorized and that the agency can conclude that they will be safe, but it needs to be able to do that and have some stability for those determinations because they're necessary for manufacturers and producers of food to be able to rely on those to help increase the shelf life of food and the robustness of the food supply in general. Petitioners come back and say the Congress intended FDA to protect the public from contaminated food and drugs, etc. So another way to look at this statute is it's sort of like a summary judgment notion that a petitioner has to come in and raise substantial questions, and then the agency has to hold a hearing and call in everybody who's relevant, the manufacturer, etc., and decide what to do. So what I hear partly from petitioners is the statutory language isn't that clear. It's not quite the same as the statute that was before the Ninth Circuit in the EPA case. The Illestra proceeding was different because it was an additional proceeding. But if I am a petitioner coming to FDA, I need to know what the rules are. And basically what I heard in the colloquy with Judge Cassis, although he raised an hour question and you're not raising that or relying on that, but it's sort of take your chances because in 2016, the agency was more aggressive on enforcement. Now, in this case, it's not. And given the serious stakes that are involved, I mean, here, in this case, the amazing thing to me is the petition comes in on 28 additives, and the and I think FDA agrees that the petitioners presented a lot of evidence, but it didn't stack up to the standard that FDA required, namely that FDA didn't have to do any more work. It could just accept what the petitioners had presented and say, we repeal the rule. And you make a lot of arguments about statutory construction, et cetera, industry reliance, floodgates, lack of budget for EPA to start all over again. And I don't take those lightly, but it does present a difficult situation for a petitioner who, having been clear as to precisely what the agency wanted, might have been able to come up with it and at least took some guidance from earlier decisions by FDA, where some of the language is not as precise as maybe would help your argument more. So, I don't see any case that has adopted this interpretation so far. And at best, we've been dealing with cases either with different statutes, different factual or procedural postures. And so, to some extent, this is a question of first impression. So, the court hasn't specifically addressed it, Your Honor, but there's a wealth of sort of sources from the statute down to agency practice and the way that burdens normally work in these proceedings that demonstrates that what the agency is requiring is consistent with all those sources. So, just to step back for a second, food additive petitions, like the one that was filed here, have only two outcomes. Either the petition is denied or the petition is granted. And when you're dealing with a repeal petition, that means the agency can either say, we are compelled to repeal this authorization based on your petition, or you have not met your burden of demonstrating that repeal is required. But I understood it. It didn't bar the agency, and maybe I misunderstood, that the agency can deny, but before making that decision, it can hold a hearing to get more evidence, to clarify the evidence it had. It doesn't have to deal only with what the petitioner has submitted, or am I wrong? In other words, you either submit the 10 documents that FDA says are required, or we don't move. So, you're correct that hearings are permissible, Judge Rogers, but they do not serve the purpose that Your Honor is identifying. A hearing is not about additional fact-finding to hear from new people and invite new evidence that's not already in the record. A hearing— To clarify what is in the record. I mean, today we're hearing that, you know, FDA said there were no animal studies. They say there are animal studies, that there were no relevant toxicity studies. They say there were toxicity studies, and I was trying to focus on this case. Well, there's a lot of expertise involved here, but that's not really the argument that's being made. So, based on the agency's scientific judgment and expertise, applied consistent with internationally recognized guidelines, the agency determined that, based on all the evidence submitted in the record collectively and looking at evidence individually, that the science did not support that that evidence then ultimately shows no reasonable certainty of no harm. And the way that the agency uses hearings is if there is a specific, you know, it's like summary genuine dispute of material fact where the agency assesses something one way and they come in with an expert and they say, actually, you're doing the science wrong. Here's how this should be done. And if there is, in fact, that genuine dispute by what the agency is saying being directly rebutted, then a hearing might be appropriate to resolve that very specific dispute. That's not what we have here. If you look at the basis for rejecting the food additive petition, the non-human primate studies, the concerns with the UK diet study, those are very specific objections that were not directly rebutted by any kind of expert submission in conjunction with the objections here. And I do just want to step back and recognize that this is just one step in the process of FDA's actions in this space. It authorizes substances. Their repeal can be petitioned for. The agency can reject that petition on the basis of not satisfying its burden. But that doesn't mean that the agency just sits back and does nothing. There's a post-market review process going on right now where the agency is looking at the data that it received in response to its request for information in 2022. And it's conducting a risk and safety assessment that will incorporate that data as relevant and ultimately issue an determination whether the agency is going to revisit the underlying safety determination. The agency pointed that out, I think, in its decision, and you pointed it out in your briefing. And if I can ask a question about that related to stamping for a second? Yes. So, in a context in which the agency itself is saying that there's some stuff here that we need to look at, and we're doing that. Trust us, we're looking at it. It just seems to me that the necessary backdrop is, hey, there might be some problems here. We're not saying that there definitely is. We're not saying that we definitely need to change the way we're looking at things. But trust us, we're looking at this because we understand that there may be some problems here, and it's something that we need to look at seriously. If that's the case, then when a party comes in and says, the thing that you said that you're going to look at seriously because there's enough of a concern about it that you're going to look at it seriously, I've got some real concerns that I've got double the exposure to it that I otherwise would, say triple the exposure to it that I otherwise would. And then against that backdrop, for a court to come in and say, which I think is the upshot of your standing argument, that look, yes, we're looking at this. It's serious enough for us to look at. But as an absolute matter, the risk that you're talking about isn't serious enough for you to get into court. It's just not. It just strikes me that there's something a little bit unbalanced about that. And I'm not talking about the increase because I think the increase here just seems to me to be pretty self-evident because the increase part of it, their petition says, what we want you to do is just flatly just repeal the authorization. So the increase seems to me it's just a difference between whether it's going to be authorized at all or whether it's not going to be authorized. So there's a pretty significant difference between those. But on the baseline level of risk that you start with, whether that level of harm is significant enough and imminent enough and as an initial matter, it just strikes me that there's something a little bit off about saying on one hand, that just isn't enough because it's out there a ways. We don't, you haven't shown that it's quantifiably significant enough. And then on the other hand saying, yeah, we get it. We're looking into this because there's some real concerns here. I'm not sure what more we should require, especially when you fold in and I'm sorry to go on and on, but especially when you fold in also that we're supposed to assume the merits in favor of the petition. Yes. And I think you're right to note that there does seem to be substantial overlap here between the merits because we are focused on the safety showing versus standing. And so I think for the reasons that we would say that they have not satisfied their burden on the merits, they also underscore why they haven't demonstrated standing here. But I think looking at their overall burden in the standing context and the specific background facts of what's going on with these dalleys, it just demonstrates that under this court's precedent for an increased risk of harm theory, they haven't shown enough. And I just want to quickly clarify, Your Honor was talking about increased exposure and how revoking authorizations will decrease exposure. We don't necessarily dispute that, but when you're looking at increased risk of harm standing, the concrete injury is not the exposure, it's the health harm. And so it's not enough to say their exposure goes down. They have to actually show that their substantial risk of health harms goes down and that if the agency revokes these authorizations, they will no longer have a substantial probability of suffering those health harms. And it's just too difficult to do that in this context, because we're talking about only five dalleys. It's not all the dalleys that are authorized. But I mean, if there's risk of self, if there's risk of harm to begin with, then there's definitely less risk of harm under their solution than yours. That's just a mathematical identity. Yes, Your Honor, but they still have to show and looking at their brief and hearing their presentation, I actually haven't heard them to discuss at all that they have to have a substantial probability of harm. Right. So that's the baseline. That's the question, not the delta, but it's the baseline that there's got to be some baseline risk of harm. And I guess my question about that is, it just seems it just there's something that doesn't quite work about saying the agency thinks that there may be enough harm here that we need to look at this seriously. But what you're showing is just not enough harm. It doesn't matter. We have enough concrete stuff to say we've got enough harm. You've shown enough risk of harm in the record to allow you to go forward. Well, I think it's in the context of what their petition doesn't ultimately show with respect to harm on the merits. I'm not saying that they have to prove harm. They have to prove no reasonable certainty of no harm. And because they haven't done that, it underscores the weakness of the argument. But don't you have to assume on the merits that they would do that for standing purposes? You have to assume that they'll prevail. But as we understand their theory, it's that they don't, that submitting some studies raising safety questions is enough. We understand their burden of what that actually has to show to be different than they do. But I just want to underscore also, Your Honor, that in this context, it's very different than, say, exposure to one source of hazardous waste, where there's one source of harm, understandable health effects, and you're not getting exposed to that through other means. Here we have phthalates, which they're just talking about the dietary exposure to five phthalates. Even if FDA revoked this, there are still four prior sanctioned phthalates that are authorized for food contact use. So this isn't removing exposure to all phthalates. It also doesn't do anything about their non-dietary exposure to phthalates, which comes from the environment and from many other sources, as the various items in the record here discuss. And also their declarations explain that they're not just worried about phthalates, they're worried about various similar chemicals that also have the same alleged effects. And so against that backdrop of this isn't removing their exposure to these phthalates, it's not addressing their exposure to other phthalates through food, it's not addressing their exposure to other chemicals, they can't show that it's these specific authorizations that are what's doing the work with respect to their health harm, and that there is a substantial probability because these specific five are only authorized in food, there will no longer be that probability if these five are revoked. It's a very difficult showing just because of the context that they have here. But regardless, the reasons that we think that they're standing our game for a particular week, particularly weak, are also the reasons that they have not succeeded in meeting their burden on the merits with respect to a showing of no reasonable certainty of no harm, and also that they're operating at this level of generality with putting things in the record and trying to point out individual issues with addressing specific studies that sort of ignores the overall context of the agency's safety determination. It's about comparing acceptable intake to exposure, it's about actually putting that toxicological data in the context of exposure. Any substance is potentially toxic at high enough levels. If you drink enough water, you could die. That's not enough to show that is harmful. You actually have to do that work of showing that the exposure is what's going to make it potentially harmful, and they have not done that in their petition, and their objections don't remedy the errors that the agency identified. Could I follow up just on standing? Um, maybe these questions are driven by similar concern as the Chief's. So, our cases do seem to say that the absolute level of risk has to be substantial. How do we think about that or quantify that in the context of these latent exposure cases? I mean, right, if you, if I think that I have a one in a hundred percent chance of getting some sort of fatal disease from some particular exposure, I probably think of that as substantial, even though in most legal contexts, like, one percent is not going to be substantial. Is that how we should think of, um, substantiality under public citizen? Um, yeah, I'm not, I'm not sure that I can, you know, speak to a specific level like that, Your Honor. I think it is the kind of thing that does depend on context, and we just fall back on the fact that in the specific context here and the compounding variables and deficiencies in their merits presentation, that that's, that's the basis that we would say that there's no standing here. If there was a slammed-on petition that did all of the work and demonstrated that there, there is no reasonable certainty of harm, um, then our standing arguments, you know, would either be non-existent or would look very different. But, um, here we just don't have the basis to conclude that they've shown enough under the, what this court has described as the very strict showings of substantiality, um, for this kind of increase of harm case. Well, in our NRDC decision authored by Judge Randolph, we answered that question. So, um, there may be ways to distinguish that case. I don't know. But, I mean, we did answer it, you know, where there was a very low probability, but that was enough. And what I'm concerned about in your arguments now about standing is, and I don't think FDA did this here, but FDA can't move a petition by taking the action that the petitioner has requested. All right? So, I didn't understand FDA to be taking that position. It acknowledges that if there were studies that it found adequate to show that these five drugs, substantial probability that they are no longer safe, et cetera. And it addressed the merits of the argument. Its position was not that, well, it has these additives on the list and it's going to issue a notice of request. Moves out the case. FDA could have done this at any point. That's not how it treated it. And I'm concerned that if this court were to say that this case is moved because the agency has issued a notice or a request for information, there's no case or controversy before us. Petitioner's position, as I understand it, is they've met their burden of persuasion under the statutory language and EPA, they say, has violated the APA, both as a matter of law and because it's been arbitrary and capricious in terms of how it addressed other cases. And the agency responded to those arguments. So if we want to cut this off at the beginning by saying there is no standing, it seems to me we have to massage, that's a gentle word, some of our precedence about what is sufficient to show standing in these increased risk cases. And maybe the court is going to step back. But I didn't understand that to be the argument that was presented to us here. Yes. So just to clarify, Your Honor, we're not trying to argue mootness at all based on the agency's other actions. And the agency is engaging in this post-market review, which is going to produce the risk and safety assessment, unclear what could ultimately come of that with respect to whether the agency undertakes future regulatory action. That's sort of a separate question. It doesn't mean that that's not the basis for saying there's no jurisdiction here. That's just the basis for underscoring that overall the way that this process is supposed to work is that the agency puts these authorizations into place and does not get rid of them unless the evidence supports that decision. And the agency is doing the work to assess whether there's new evidence that was not in the record with respect to this petition that would require it to revisit its safety determination. With respect to standing, we think that our standing arguments here fall squarely within how the court explains standing in the public citizen cases and in the food and water watch case. Specifically, Your Honor, if the court looks at the second public citizen case where the court assessed the declarations that were put into the record in an attempt to meet their burden with respect to increased risk standing, it shows the kind of heightened showing that's necessary that is not met here. And as I believe it was said— Did it overrule the NRDC case? No, but it drew its— Randall? It drew its standards, specifically said that it was drawing its standard and how it applied it both NRDC and Mountain States. And so it was based on past precedent of this court was trying to synthesize what it meant to satisfy an increased risk of harm standing analysis. But remember, it, public citizen, set up a two-pronged requirement. And Susan B. Anthony, by the Supreme Court, said you didn't have to show both. All right? So that's where we are now. So the Susan B. Anthony case was about pre-enforced risk standing, and the food and water watch case, which postdated Susan B. Anthony and cited Susan B. Anthony, continued to reiterate the standard that we're discussing here. And so I think this court— I agree, but it's not the two-pronged standard of public citizen. That's all I'm getting at. You know, public citizen said you had to do one, and you had to do two, and then it sent it back to get some more information, and then the second case came. So I disagree, Your Honor. I think food and water watch actually does just recite the exact same standard from public citizen having the two prongs. It didn't need to address both of them because it determined that there wasn't a sufficiently substantial increased risk, but it did recite the exact same standard. What did it do about Susan B. Anthony? I believe that case really focused on pre-enforcement standing and not about an increased risk of harm of something happening. It was about whether a potential future enforcement could be determined to be as imminent and concrete injury for the purposes of suing in advance of something being applied. So let me be clear what your response to my colleague's question about standing was. What is your position? What is FDA's position on whether the petitioners have Article III standing? So in this case, we think that based on how hard it is to show increased risk of harm standing in the context of under-regulation of a third party under this court's precedence, that they simply, based on the weaknesses and the substance of their petition, they simply haven't done enough to do that here. But as Judge Shura often noted earlier, there does seem to be a lot of substantial overlap in these questions with the merits, and so if the court disagrees or thinks those are entirely intertwined, it can simply just proceed to the merits in this case. No, I don't think that's correct after Steele Company. I mean, often the court has to look to the merits to determine whether or not there's Article III standing, and does. All right? But that doesn't mean we can just say, well, you know, you lose on the merits, so we don't have to do anything. So I'm concerned about this issue, because I think this increased harm area is a very difficult area in terms of what does a petitioner have to show. And I understand FDA's argument about how it interprets the statute and why. But ultimately, after Loeb or Wright, that's a decision for us. But in any event, I guess. So your point is that because petitioners showing, factual showing, in support of its merits argument, seeking repeal was so weak, therefore, it doesn't have Article III standing because it can't meet the significant showing of substantial likelihood, et cetera. In the context of this case, we do think that there's, those issues substantially overlap, Your Honor. And so if the court doesn't have to see... Where, you know, a factory doesn't have to close. A factory doesn't have to go bankrupt. But it can still have standing to come in and challenge an agency regulation that it says is harming it. And it may be wrong. But that's a merits issue. And we haven't treated those as an Article III threshold issue. And that's what I'm trying to understand here. I mean, all these people say they eat chicken. They're very concerned about this. They joined organizations or they put up a lot of money for these organizations to pursue their interests. And they want FDA to do its job as they conceive it. And FDA isn't saying it's not going to do its job. It's just saying, what you have presented to us is not enough under the statutory standard. Yeah, we think that is, it underscores why they lack standing. But it also, because it is so in line with the merits in this case, it just demonstrates that they had this burden. The agency determined in the basis of its expert scientific judgment that they had not put in the kind of evidence that would have satisfied their burden in this case. And so the result is to deny the petition on that basis. And then the agency will proceed with its post-market review that it's already conducting in this space to look at new evidence and determine whether the safety determination ultimately has to be revisited. Okay, let me make sure my colleagues don't have any additional questions at this point. If there are no further ones, we'll hear from the petitioner's counsel. Thank you, Your Honor. Thank you, Ms. Newmaster. Ms. O'Brien, we'll give you the three minutes you asked for. Thank you, Your Honor. I'll end there to make three points quickly. With respect to standing in response to Judge Katz's question, the court affirmed in Food and Water Watch that this court does not require a quantitative analysis demonstrating a specific probability of future health harm to establish standing. Furthermore, in the Mountain States Legal Foundation case discussed in our brief, the court affirmed that relatively modest increments in risk are sufficient to support these types of standing theories where the risk of injury is serious. Here, we are talking about permanent harm to children's brain development, the inability to have children, and other severe health risks for which a modest incremental risk is sufficient to support standing. The court also held that the existence of other factors contributing to the risk does not defeat standing. So, government counsel's argument about the unfortunate presence of other chemicals that also contribute to these health risks does not undermine standing. Second, I want to note that the government is grasping for support for what are really ad hoc criteria that it applied to the petition in this case that do not have any foundation in the statute or the regulations. The discussion about having to compare an ADI to an EDI or comply with international standards, those are not in any statutory provision, regulatory provision, or even a guidance document that the government can point to. The government does not even require those specific demonstrations for approval petitions for food additives, and we know from the record here that the agency itself has nothing like the evidence it's demanding from petitioners to support its own safety findings for these chemicals, and it is fundamentally arbitrary for the agency to say we haven't done enough to disturb safety findings that are based on radically outdated toxicity evidence and no exposure evidence. That is arbitrary. Finally, the promise of a future safety review on FDA's chosen timetable is inconsistent with the scheme that Congress established here, which permits petitioners to trigger a requirement for FDA to update its assessments through the petition process, and it's also a cold comfort given that FDA has been promising the public, Congress, and now this court for 18 years that it will update the safety reviews for these chemicals while we all continue to consume them in our food. FDA is now seeking this court's blessing to just keep kicking that can down the road for as long as the agency sees fit, and we respectfully urge the court not to the agency that cover and instead to revoke, excuse me, to vacate the unlawful order that's before the court here. Thank you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Katsas; Rogers